UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: MARQUETTE TRANSPORTATION COMPANY, LLC    *    CIVIL ACTION

*    NO. 15-2316

*    SECTION "L"(3)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    FACTUAL AND PROCEDURAL HISTORY**

This case arises out of a December 29, 2014 allision between barges in the tow of M/V MYRA ECKSTEIN, a tugboat owned and operated by Marquette Transportation Company, LLC ("Marquette"), and barges MISS DARLENE and MISS ASHLEY, owned by Monticello Equipment Corporation ("Monticello") and operated by Kostmayer Construction, LLC ("Kostmayer"). At the time of the allision, Marquette was operating the M/V Myra Eckstein near the CEMUS Dock Facility located on the East Bank of the Mississippi River in Baton Rouge, LA. The M/V Myra Eckstein "contacted" the two crane barges operated by Kostmayer. At the time of the accident, the MISS DARLENE crane barge was spudded down off the East Bank of the Mississippi River, in relation to work Kostmayer was completing on an upriver mooring dolphin attached to the CEMUS dock near the 190 bridge in Baton Rouge at mile post 233.8 AHP. The MISS ASHLEY was secured to the CEMUS dock. Plaintiffs Joseph Solomon ("Solomon") was employed by Ameri-Force Craft Services, Inc. ("Ameri-Force") and assigned to work for Kostmayer. At the time of the accident, Solomon was working on the MS Ashley, one of the crane barges involved in the allision.

On June 25, 2015, Marquette filed for limitation of liability relating to this incident. R. Doc. 1. On July 31, 2015, Solomon answered the limitation of liability as a claimant. Solomon

1

avers that when the M/V Myra Eckstein allided with the barge where he was working, he sustained personal injuries. Solomon seeks various damages, including loss of earnings and earning capacity, pain and suffering, and mental anguish and emotional trauma. Solomon also brought a third-party claim against Kostmayer as his Jones Act employer. He seeks damages under the Jones Act, 46 U.S.C. § 30104, and general maritime law.

On January 6, 2016, Interested Builders Risk Underwriters ("IBRU") answered Marquette's limitation in liability as a claimant. IBRU was an insurer of Kostmayer for the barges and dock involved in the allision. IBRU claims that it is legally and/or contractually subrogated to the rights or claims of Kostmayer by virtue of payment of claims for the damage caused by the allision.

This matter came on for trial without a jury on the liability portion of the case on February 8, 2018. The trial lasted two days. The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

(1)

Marquette Transportation Company, LLC ("Marquette") is a company in the marine transportation business. It regularly moves cargo in barges along the inland waterway including the Mississippi River. Marquette is the owner of the M/V MYRA ECKSTEIN. Marquette was

the employer of the crew, including the Captain (Keith Trout), aboard the M/V MYRA ECKSTEIN on December 29, 2014.

(2)

Ameri-Force Craft Services, Inc. ("Ameri-Force"), is a domestic corporation that in part provides skilled professionals and laborers to the marine, industrial, heavy construction industry.

(3)

Signal Mutual Indemnity Association, Ltd. ("Signal"), is a group self-insurer, authorized by the Department of Labor to discharge the liability of its members, including Ameri-Force, under the Longshore and Harbor Workers' Compensation Act 33 U.S.C. 901 et seq. (LHWCA) as a result of injuries to their employees.

(4)

Kostmayer Construction Company, LLC ("Kostmayer") is an industrial construction contractor and its operations include maritime construction within the State of Louisiana.

(5)

Joseph Solomon is a resident of Ascension Parish, Louisiana and has worked most of his life as a welder and fitter on industrial construction projects, some of which were maritime in nature.

(6)

On February 17, 2014, CEMUS contracted with Kostmayer for the performance of repairs to the CEMUS dock facility (the "CEMUS project"), with the condition that Kostmayer was obligated to obtain all necessary permits and ensure the work was performed pursuant to the permits. Kostmayer received specifications showing the 1998 plans (Drawing 19430-10 shows a 200-foot walkway) and a separate drawing in the same bid package (19430-52) that shows the

extension for two ships to the property line. The 2012 plans, through drawing 19430-52, positioned the UMD 285 feet upriver from the Upper Dock, 85 feet further upriver than shown in the 1998 plans approved by the Corps of Engineers. While work was performed at the UMD and Upper 9 Dock, Kostmayer was also involved in construction work at the lower end of the dock. The construction work began in July 2014 and was progressing at the time of the December 29, 2014 allision.

(7)

In order to complete the CEMUS project, Kostmayer utilized a fleet of barges, some of which it owned and others which were leased but were under the direction and control of Kostmayer, including the MISS ASHLEY and MISS DARLENE. Kostmayer also hired some employees through Ameri-Force. One such employee, Joseph Solomon, filled out his application on September 26, 2014, and was hired as a structural fitter. Beginning the following week, Solomon commenced working from Kostmayer barges repairing and constructing the dock. Solomon was supervised by Kostmayer employees, Kostmayer provided tools and other equipment for him to perform his tasks, and Solomon was directed by Kostmayer employees at the CEMUS project. Mr. Solomon had never worked under the direct and/or control of Kostmayer before he began working on the CEMUS project.

(8)

At all relevant times, Solomon was the payroll employee of Ameri-Force and the borrowed employee of Kostmayer. From October through the time of the incident, Solomon worked almost exclusively from the man-lift on one barge, the MISS ASHLEY. The MISS ASHELY was 30 feet wide and 120 feet long with a raked bow. The MISS ASHLEY was outfitted with a man-lift and cherry picker which were utilized by the Kostmayer employees to work on the CEMUS dock. The

4

MISS ASHLEY was moved by a tug into position along the dock. It was periodically moved and repositioned as the work progressed. When the barge was moved, Solomon, among other employees, assisted with the lines and positioning equipment to allow the barge to be moved safely. Solomon worked as a structural fitter, repairing and constructing the dock structure by removing old metal framework and installing new beams and supports. This work was conducted using the man-lift to access and remove the damaged portions of the dock. The new pieces were measured and cut from the deck of the barge. These pieces were raised with the cherry picker and then fitted into place from the man-lift. On occasion, structural fitters would complete some of this work from the scaffolding attached to the dock. However, Solomon rarely worked from the scaffolding. The MISS ASHLEY was equipped with a cherry picker crane and a man-lift, including a built-in generator, and all other equipment necessary to complete the fitting tasks. The fitting tools were stored in a seacan on the barge. Additionally, the employees working on the barge, including Solomon, were provided and required to wear a work vest equipped with floatation for their safety.

(9)

At the time of the December 29, 2014 accident, Solomon worked from the man-lift, equipment installed on the MISS ASHLEY throughout his employment, as the barge was operating from the Mississippi River. Except for a few times during his employment, he always worked from the MISS ASHLEY which utilized both the man-lift and a cherry-picker to construct the dock throughout the CEMUS project. Between October and the time of the accident in December 2014, all of the structural fitting and work he performed occurred from the barge. He never worked from the dock to remove the damaged decking. Instead, he used the man-lift positioned on the barge MISS ASHLEY, almost exclusively to remove this old material.

Solomon's work as a fitter for Kostmayer/Ameri-Force was essential to accomplishing the mission of the MISS ASHLEY, namely constructing the dock structure by removing old metal framework and installing new beams and supports.

(10)

On December 29, 2014, Marquette's tugboat, M/V MYRA ECKSTEIN, was proceeding down bound on the Mississippi River pushing a fleet of 35 standard river barges, 5 barges long and barges wide. The barges assemblage measured approximately 245 feet in width and 1000 feet in length. The tug generated 7200 horsepower. Captain Keith Trout was the captain on watch aboard the M/V MYRA ECKSTEIN on December 29, 2014. Prior to reaching the 190 bridge, the M/V Myra Eckstein came around Wilkerson Point, which is a hair over a mile from the US 190 bridge. Captain Trout visually observed the Kostmayer barge from a distance of 1 mile. The Kostmayer barge was also visible on the Captain's radar at a distance of 1 mile. As the M/V MYRA ECKSTEIN navigated through a standard location for passage under the Highway 190 Bridge between the number 1 and 2 bridge spans, it allided with Kostmayer's barge, MISS DARLENE, spudded on the center channel side of an upriver mooring dolphin ("UMD") under construction by Kostmayer and continued down river and struck the MISS ASHLEY which was moored to the CEMUS dock.

(11)

Prior to December 29, 2014 allision, Captain Trout had transited under the US 190 bridge 30 to 50 times. Captain Trout had been through the bridge southbound within a month of the incident. When the Captain last passed through the area there were barges in the vicinity of the mooring dolphin. Captain Trout knew about the ongoing work being performed upriver of the CEMUS dock prior to arriving in the area on December 29, 2014. Captain Trout had passed the

location in the past and observed the work being performed on the dock from moored barges. In addition, Marquette had created a River Conditions Summary that informed Marquette's captains of hazards on the river referencing the locations of the hazards by river mile. By August 11, 2014, Marquette had disseminated a River Conditions Summary to its captains that specifically identified the construction at the CEMUS dock as a high risk hazard.

(12)

Captain Trout's original plan was to navigate the tug and tow as close as possible to the western leg/support column of the US 190 bridge, referred to as pier number 2. He state that as he rounded the bend at Wilkerson Point he was deeper in the bend than he intended and came close to striking a dock upriver from the 190 bridge. After coming around Wilkerson Point, Captain Trout visually observed the Kostmayer barge moored to the upriver mooring dolphin at a distance of 1 mile. Captain Trout stated that while at the controls of the MYRA ECKSTEIN, he lost focus on the task at hand. After coming around Wilkerson Point, Captain Trout focused solely on the barge that was alongside the mooring dolphin and lost situational awareness. Captain Trout testified, "I was focused on that (the barge) and wasn't paying attention to the task at hand." As a result, Captain Trout navigated the MYRA ECKSTEIN too close to the east bank of the river. The starboard corner of the MYRA ECKSTEIN barge was approximately 200 feet from pier number 2 while Captain Trout intended be closer than 100 feet from the pier.

(13)

No adverse weather conditions or traffic conditions prevented Captain Trout from piloting his tow more towards the middle of the river. It was an average day, visibility was good, there was no fog or rain, the winds were light, 5 mph and, notably, the current was very minimal, less than 2 mph. When the M/V MYRA ECKSTEIN came around Wilkerson Point there was no

7

traffic between her and the US 190 Bridge. The M/V MYRA ECKSTEIN was not meeting any northbound upriver traffic, no other traffic was coming through the bridge, there was no moving vessel traffic, and there was nothing in the water obstructing the path of the M/V MYRA ECKSTEIN.

(14)

Kostmayer had two barges onsite, which were struck by the Marquette tug and tow: the first, the MISS DARLENE, was a crane barge moored beside the upriver mooring dolphin while the second, the MISS ASHLEY, was a smaller barge equipped with a "cherry picker" crane and a man lift and was moored beside the dock down river from the mooring dolphin. The dimensions of the crane barge, MISS DARLENE, are a length of 145 feet and breadth of 70 feet. She has a raked bow for ease of movement.

(15)

Just beneath the 190 bridge, the M/V MYRA ECKSTEIN struck the crane barge positioned beside the upriver mooring dolphin with the port-side front corner of her foremost barge under tow. The M/V MYRA ECKSTEIN then traveled down river and struck the barge with the cherry picker and man lift pushing the barge into the dock. The M/V MYRA ECKSTEIN then continued downriver to a fleet in College Town to deliver several barges.

(16)

At the time of the incident, most of Kostmayer's employees had left the scene for lunch. No Kostmayer employee was assigned as a lookout, and no construction supervisor or vessel watchstander was monitoring the river. Additionally, Kostmayer did not alert the Coast Guard of the position of its barges during construction or direct a tug to communicate with oncoming river traffic.

## III. CONCLUSIONS OF LAW

(1)

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 30104. Venue is proper because the Defendants are subject to the personal jurisdiction of this Court.

(2)

The parties have designated this matter as an Admiralty and Maritime claim within the meaning of Federal Rule of Civil Procedure 9(h), and as such, this matter is appropriately being tried to the bench as opposed to a jury.

(3)

The matters before this Court include determination as to whether Joseph Solomon was a Jones Act seaman at the time of the December 29, 2015 accident, whether Marquette and/or Kostmayer were negligent under the Jones Act and general maritime law, and whether the vessel the MISS ASHLEY was unseaworthy under general maritime law.

(4)

The Supreme Court has determined that seaman status requires: (1) that the employee's duties contribute to the function of a vessel in navigation (or identifiable group of vessels) or to the accomplishment of its mission and (2) that the connection be substantial in terms of both its nature and duration. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). The purpose of the test is to "separate the sea-based maritime employees who are entitled to Jones Act protection from those landbased workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.*

(5)

Solomon was a borrowed employee of Kostmayer, working as directed by Kostmayer supervisors on and from equipment provided and operated by Kostmayer. The MISS ASHLEY and other barges utilized by Kostmayer were vessels under the general maritime law. By virtue of his assignment to and substantial performance of his work aboard the MISS ASHLEY, a vessel in navigation, Solomon had a connection to the barges which was substantial in nature and duration; during his employment all of his work was performed from the MISS ASHLEY; his work advanced the function of the MISS ASHLEY whose mission was to serve as a construction vessel. Therefore, he is a seaman, with the right to assert a Jones Act negligence claim, and a general maritime law unseaworthiness claim, against his borrowed employer Kostmayer. Solomon also had the right to assert a general maritime law negligence claim against Marquette.

(6)

Under general maritime law, there is a long-standing presumption that, when a moving ship collides with a stationary object, the moving ship is at fault. *The Oregon*, 158 U.S. 186, 192-93 (1895). "The rule of The Oregon creates a presumption of fault that shifts the burden of production and persuasion to a moving vessel who, under her own power, allides with a stationary object." *Combo Maritime. Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 604 (5th Cir. 2010). The moving ship in an allision case may rebut the presumption of fault by showing, with a preponderance of the evidence, that the collision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the collision was an unavoidable accident.

(7)

The Pennsylvania Rule is "a presumption in admiralty law that a statutory violation by a party to a collision is a cause of the damage unless it is established that the violation could not have caused or contributed to the collision." *Am. River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 449 (5th Cir.1998). For the Pennsylvania Rule to apply, three elements must exist: (1) proof by a preponderance of evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. *See United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116–17 (5th Cir.1985). As established in *The Pennsylvania*, 85 U.S. 125 (1874), where a party violates a statute or regulation intended to avoid collisions, that party must prove its conduct not only might not have caused the accident, but it could not have caused the accident:

> The Pennsylvania Rule requires the violator of a statute to show not only that its conduct was not a contributing cause of the collision, but that it could not have been a cause of the collision. The Pennsylvania Rule clearly applies to [wharves] as well as vessels.

*Florida E.C.R. Co. v. Revilo Corp.*, 637 F.2d 1060, 1064 (5th Cir. 1981).

(8)

In order to build a structure on the navigable waters of the United States, a permit for the anticipated structure must be obtained:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.

33 U.S.C. § 403. The authority of the Federal Government to exercise control over navigable waters is established in the Constitution:

> All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various states and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution.

*United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 63 (1913) (quoting *Gibson v. United States*, 166 U.S. 269, 271 (1897)).

(9)

The Pennsylvania rule shifts the burden of proof as to causation. *Green v. Crow*, 243 F.2d 401, 403 (5th Cir. 1957). "This rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, 'the burden rests on the ship of showing not merely that the fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" *Otto Candies, Inc. v. M/V Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983) (quoting *The Pennsylvania*, 86 U.S. 125, 136 (1873)). The Pennsylvania Rule applies to breaches of a permit issued by the Corps. *See Orange Beach Water, Sewer and Fire Protection Authority*, 680 F.2d 1374, 1383 (11th Cir. 1982) (citing *American Zinc Co. v. Foster*, 313 F. Supp. 671 (S.D. Miss. 1970), modified on other grounds, 441 F.2d 1100 (5th Cir. 1971), cert. denied, 404 U.S. 855 (1971)).

(10)

To establish a claim for negligence under the general maritime law, the plaintiff must prove "that there was a duty owed by the defendant to plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *In re Cooper/T Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991). The existence and scope of a duty under the general maritime law turns primarily on "the foreseeability of the harm

suffered by the complaining party." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir.1987). In maritime collision cases, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Bd. of Comm'rs of Port of New Orleans v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir. 1978). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" *Am. River Transp. Co.*, 148 F.3d at 450 (quoting *Inter-Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979). Physical damage to shore structures and to fixed objects such as the dock in question is compensable. Where the damage is reparable, there is liability for reasonable repairs. *See City of New Orleans v. American Commercial Lines, Inc.*, 662 F.2d 1121 (5th Cir.1981).

(11)

The Rivers and Harbors Act prohibits vessels from become "obstructions" in an effort to prevent collisions. It provides, in relevant part: "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." 33 U.S.C. § 409. "Obstruction" is defined as "anything that restricts, endangers, or interferes with navigation." 33 C.F.R. § 64.06. The percentage of the width of the waterway which is not obstructed is significant in determining whether the waterway is obstructed under the Act. *See Williamson Leasing Co., Inc. v. American Commercial Lines, Inc.*, 616 F. Supp. 1330, 1338 (E.D. La. 1985).

(12)

The Rivers and Harbors Act, 33 U.S.C. § 403, is a statute that involves marine safety or navigation. *See Mike Hooks Dredging Co., Inc. v. Eckstein Marine Service, Inc., et al*, 2012 WL 1070106, at * 5 (E.D. La. Mar. 29, 2012). The Rivers and Harbors Act specifically prohibits

13

obstructions to the navigable capacity of any waters of the United States. 33 U.S.C. § 403. A violation of the Rivers and Harbors Act triggers the Pennsylvania Rule relating to obstructions. *See Crowley v. Costa*, 924 F. Supp. 2d 402, 418-419 (D. Conn. 2013).

(13)

Kostmayer was obligated to ensure the UMD was properly permitted, and was constructed in accordance with such permit. The permit obtained by CEMUS in March, 2013 allowed construction of the UMD 200 feet upriver from the Upper Dock pursuant to the 1998 plans submitted to the Corps of Engineers in October 2012. Kostmayer, however, constructed the UMD 285 feet upriver from the Upper Dock. Kostmayer violated the terms of the permit by constructing the UMD in a location outside the area allowed by the Corps of Engineers.

(14)

The Court finds that Kostmayer violated the permit by constructing further upriver than allowed by the permit and that triggers statutory fault. Initially, the permit approved by the Corps requires CEMUS, the dock owner, and Kostmayer, the repair contractor, to comply with conditions related to safe navigation. The permit states that the work should not create an obstruction to safe navigation. A maintenance permit, just like a general permit and modification approvals, also requires the owner/contractor to issue Notice to Mariners and not to obstruct navigation. The permit also specifically addresses that if the project includes "any additional work" not authorized herein, the permittee "must apply for an amendment." This violation justifies application of the Pennsylvania Rule. Kostmayer's conduct was negligent, and it failed to carry its burden under the Pennsylvania Rule to prove that its violations could not have caused the accident.

(15)

Kostmayer was also negligent in failing to alert the Coast Guard about the position of its barges during the course of construction on the dock and its failure to utilize an assist vessel to communicate with river traffic and warn employees of impending allisions. Thus, the Court concludes Kostmayer's conduct was a negligent cause of the accident.

(16)

IBRU is a subrogee of Kostmayer by virtue of a contractual subrogation clause contained in its policy. By proceeding on a subrogation claim, IBRU's rights and claims against Marquette are no greater than those of Kostmayer. The negligence of Kostmayer directly impacts IBRU's subrogation claim. A party claiming by way of subrogation has no greater rights than the party from whom the claim was obtained. Therefore, IBRU's claim against Marquette must be reduced by the percentage of Kostmayer's liability for the accident.

(17)

Furthermore, the Inland Navigation Rules apply to vessels on the Mississippi River. *See, e.g.*, *Transorient Navigators Co., S.A. v. M/S SOUTHWIND*, 714 F.2d 1358 (5th Cir.1983). The Inland Navigational Rules ("INRs"), 33 C.F.R. § 83.01 et seq., impose a duty of care on vessel owners and operators to operate such vessels under the "rule of good seamanship" and in a safe and seaworthy manner. *See* Thomas J. Schoenbaum, Admiralty & Maritime Law at 760-64 (2d ed. 1994).

(18)

Rule 6 of the Inland Navigational Rules provides, in pertinent part:

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(i) The state of visibility;
(ii) The traffic density including concentration of fishing vessels or any other vessels;
(iii) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
(iv) At night, the presence of background light such as from shore lights or from back scatter of her own lights;
(v) The state of wind, sea, and current, and the proximity of navigational hazards;
(vi) The draft in relation to the available depth of water.

33 C.F.R. § 83.06.

(19)

Captain Trout violated Rule 6 in that he failed to proceed at a safe speed as he rounded Wilkerson Point and approached the US 190 bridge. The use of radar, in and of itself, is not sufficient to exempt a vessel from proceeding at a safe speed. *N.V. STOOMVAART MAATSCHAPPIJ v. Standard Oil Co. of California*, 398 F.2d 835 (9th Cir.1968), cert. denied, 393 U.S. 980 (1968).

In order [to be found] to travel at a safe rate of speed, a vessel should be able to stop within one-half the distance of visibility forward from her bow. *Holland-America Line v. M/V JOHS. STOVE*, 1968 A.M.C. 2012, 2016 (S.D.N.Y.1968).When conditions are such that a vessel cannot proceed in such fashion, she should not be underway in the first place. *The PENNSYLVANIA*, 86 U.S. (19 Wall.) 125, 134 (1873).

(20)

Rule 7 of the Inland Navigational Rules, 33 C.F.R. § 83.07, provides in pertinent part:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including longrange scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumption shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change.

(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

(21)

Captain Trout violated Rule 7 by failing to use all appropriate means to determine whether a risk of allision existed, and to take appropriate, timely, and responsive action to avoid the allision. Marquette had previously sent a Notice of Marine Hazards regarding the CEMUS dock construction site. Captain Trout failed to read this Notice of Marine Hazards provided by Marquette to alert captains about the hazard.

(22)

33 C.F.R. § 83.09 Rule 9(a)(i) regarding Narrow channels requires "[a] vessel proceeding along the course of a narrow channel or fairway [to] keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." "Although the [Inland Navigation Rules] do not define 'narrow channel,' we have held that the term generally includes bodies of water that are less than 1,000 feet in width." *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 892 (5th Cir. 2013).

(23)

Under Rule 9, the M/V Myra Eckstein was obligated to stay as far to her starboard as was "safe and practicable." She failed to do so; had she done so, the allision would not have occurred. Captain Trout was "way more off" pier number 2 than he wanted to be." He was too deep in the

bend as he rounded Wilkerson Point and was distracted by the barges working on the CEMUS dock and failed to navigate closer to Pier 2 of the 190 bridge.

(24)

The M/V MYRA ECKSTEIN navigated in an unsafe manner by steering outside the navigable channel when she could have steered closed to pier number 2. Captain Trout admittedly violated Inland Rules 6, 7, and 9. Captain Trout was negligent in failing to pay close attention while manning the M/V MYRA ECKSTEIN; Captain Trout's negligent operation of the M/V MYRA ECKSTEIN was a cause of Joseph Solomon's injuries.

(25)

"To establish a claim for unseaworthiness, 'the injured seaman must prove that [his employer] has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (*quoting Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). This also gives rise to a claim for negligence under the Jones Act. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Simmons v. Transocean Offshore Deepwater Drilling, Inc.*, 551 F. Supp. 2d 471, 476 (E.D. La. 2008).

> A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper.

*Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500 (1971) (internal citations omitted). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985). The duty of the

vessel owner to provide a seaworthy vessel is an absolute non-delegable duty. A breach of this duty when an employer knew or should have known of the unsafe method also gives rise to a negligence claim under the Jones Act.

(26)

To recover damages from an unseaworthy condition, or from negligence, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy or resulted in negligence. *See Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992). "To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). In order for a plaintiff to recover for negligence under the Jones Act he must show that the negligence was a cause, however slight, in producing his injury. *See Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997); *CSX Transp. Inc. v. McBride*, 564 U.S. 685, 692 (2011).

(27)

Kostmayer had a non-delegable duty to provide Solomon with a safe place to work and to provide seaworthy equipment and crew on the vessel. The credible evidence supports the finding that Kostmayer breached this duty as it failed to properly locate and man its vessel, the MISS ASHLEY, specifically by failing to provide any warning regarding potential allisions. This rendered the MISS ASHLEY unseaworthy and also resulted in negligence which was a cause of the allision on December 29, 2015 and Solomon's injuries.

The Court hereby concludes that the MISS ASHLEY was unseaworthy and Plaintiff's injuries and resulting damages were proximately caused by the vessel's unseaworthiness, as well as the Kostmayer's negligence in failing to provide him with a safe place to work.

(28)

It is a fundamental rule in admiralty law that damages "are to be apportioned on the basis of the comparative fault of the parties." *Pennzoil Producing Co. v. Offshore Express Inc.*, 943 F.2d 1465, 1469 (5th Cir. 1991). Liability for property damages sustained in this maritime collision must be allocated according to the degree of the parties' comparative fault, this is so even where one party is guilty of statutory violations. *Florida East Coast Ry. v. Revilo Corp.*, 637 F.2d 1060, 1066–67 (5th Cir.1981). District courts have considerable discretion in assigning comparative fault. Analyzing all the evidence presented, it comes to a conclusion based upon the number and quality of the faults of each party, and the part they played in causing the casualty. *See, e.g.*, *United Overseas Export Lines, Inc. v. Medluck Compania Maviera*, 785 F.2d 1320, 1326 (5th Cir. 1986) (affirming district court's sixty-five percent/ thirty-five percent apportionment of fault); *Gele v. Wilson*, 616 F.2d 146, 148 (5th Cir. 1980) ("The calibration of culpability is simply not susceptible to any real precision.").

(29)

The allision was caused by the combined fault of Marquette and Kostmayer. The Court finds that as to damages to the barges and dock, Marquette is 80% liable and Kostmayer is 20% liable. As to Solomon's damages, Marquette is 50% liable and Kostmayer is 50% liable.

New Orleans, Louisiana, this 14th day of February, 2018

_____
UNITED STATES DISTRICT JUDGE